IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

R. ALEXANDER ACOSTA,         )
                                  )
        Plaintiff,           )
                                  )       NO. 3:17-cv-01381
v.                            )       JUDGE RICHARDSON
                                  )
RAUL PEREGRINO, et al.,      )
                                  )
        Defendants.      )

## MEMORANDUM OPINION

Pending before the Court are Plaintiff's Cross Motion for Partial Summary Judgment (Doc.

No. 53), and Defendants' Motion for Summary Judgment (Doc. No. 56).[1]  The parties have filed

---

[1] There is some dispute between the parties regarding what issues they were allowed to present in their motions and whether they were allowed to move for summary judgment or just partial summary judgment. Plaintiff claims that, during a case management conference, the parties were instructed to only brief motions for partial summary judgment. (Doc. No. 64 at 1-2). Defendants claim that the deadline set during the case management conference was for all dispositive motions and that part of the conversation occurred before counsel for Plaintiff joined the call. (Doc. No. 69 at 1-2; Doc. No. 71 at 1-2). The parties stated in their Joint Status Report prior to the case management conference that they wished to "request permission to move for summary judgment, including the filing of motions for partial summary decision on this issue." (Doc. No. 47 at 1). Plaintiff's Motion for Partial Summary Judgment is limited to the proper classification of the workers. (Doc. No. 53). Defendants' Motion is for summary judgment as to the entire case. The Court agrees with Defendants that if it were to grant partial summary judgment in favor of the Defendants on the same issue as to which Plaintiff has moved for summary judgment (proper classification of the workers), Plaintiff would be unable to make out its prima facie case under the FLSA, so there is no reason for the Court to construe Defendants' Motion as more limited. The Court will consider both Plaintiff's Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment. Since the motions address the same factual and legal issues, the Court will discuss both motions in the same analysis section.

1

their respective responses and replies to the respective motions, and the motions are ripe for review.[2]

## **BACKGROUND**

UNDISPUTED FACTS[3]

Plaintiff, the Secretary of Labor,[4] brings this action alleging that Raul Peregrino, Raul Peregrino Drywall, and Peregrino's Drywall ("Defendants") failed to pay overtime wages to 129 individuals ("workers") and thereby violated the Fair Labor Standards Act ("FLSA"). (Doc. No. 1-2).

Contractors with a need for drywall work on a project contact Defendants to offer them jobs. (Doc. No. 61 ¶ 2). Defendants then decide whether to take a project after negotiating a per-sheet price. (*Id.* at ¶ 3). Defendants will contact individuals whom they have used in the past or whom have stated they are available in order to find someone to complete the drywall laying and finishing. (*Id.* at ¶¶ 5, 6). In August 2018, Defendants had approximately 45 to 48 people working for them, and all but one of those individuals were drywall workers. (*Id.* at ¶ 3).

---

[2] The Court will refer to Defendants in the plural, as that is the way the Complaint is styled, even though the docket sheet refers only to a single Defendant—which seems correct inasmuch as it appears that the sole party being sued is Raul Peregrino, apparently a sole proprietor doing business under a couple of trade names similar to one another. When referring to what Raul Peregrino himself did (or supposedly did) in connection with his business, the Court generally will refer to him as Peregrino and not as "Defendant" or "Defendants." Likewise, when referring to statements made by Raul Peregrino in his affidavit (Doc. No. 59-1) or deposition (Doc. No. 54-5), the Court will refer to him as "Peregrino."

[3] Unless otherwise noted, the facts in this section are taken from facts in the Complaint and Amended Complaint that are not disputed and the parties' Responses to Statements of Undisputed Facts (where the facts are undisputed). *See* Doc. Nos. 1, 33, 61, 65.

[4] When the Complaint (Doc. No. 1) was filed, R. Alexander Acosta was the Secretary of Labor. Over the course of the litigation, Mr. Acosta was replaced by Eugene Scalia, who now serves as Plaintiff in this case. *See* Fed. R. Civ. P. 25(d) (the successor of a public officer who is a party in an official capacity is automatically substituted as a party).

2

Defendants pay the workers on a per-sheet basis. (*Id.* at ¶ 25). If the workers worked more than 40 hours in a given week, they would not be given overtime, because the Defendants believed the relationships to be that of an independent contractor. (*Id.* at ¶ 34).

The Secretary of Labor conducted an FLSA investigation with respect to the period of December 28, 2014 to December 25, 2016. (Doc. No. 57-2 at 1; Doc. No. 57-4 at 5). The Department of Labor's investigators conducted interviews with seven of Defendants' workers and visited two jobsites, both run by the same contractor. (Doc. No. 57-1 at 11). The Department of Labor's investigators determined that Defendants had failed to pay overtime and owed back wages in the amount of $686,222.80. (Doc. No. 57-2 at 2). The present lawsuit involves Plaintiff's claims against Defendants for not paying overtime wages to their alleged employees (the workers).

Plaintiff has moved for partial summary judgment (Doc. No. 53), and Defendants have moved for summary judgment (Doc. No. 56). Specifically, Plaintiff has moved for partial summary judgment because it believes the workers were employees, not independent contractors. Defendants have moved for summary judgment because they believe the workers are independent contractors.

DISPUTED FACTS

As discussed below, many of Plaintiff's objections arise from evidentiary issues, but there are also substantive disputes of fact. The parties dispute the amount of experience workers needed to be hired by Defendants. (Doc. No. 61 ¶ 3; Doc. No. 65 ¶ 7). The parties disagree about which tools the workers were expected to provide themselves, versus those that were provided by Defendants or by the general contractors. (Doc. No. 61 ¶¶ 38, 39, 42, 43, 44, 46, 47; Doc. No. 65 ¶¶ 16, 17, 19, 68, 72). The parties also disagree regarding how much control Defendants exerted

over the workplace and the workers' drywall laying and finishing. (Doc. No. 61 ¶¶ 30-33; Doc. No. 65 ¶¶ 23, 39, 68, 72).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248, 106 S. Ct. 2505. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]' " *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

4

The court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

## EVIDENTIARY ISSUES

The Court will first address evidentiary issues presented by Defendants' affidavits of many of the workers at issue, before turning to the substance of the summary judgment arguments.

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 674 Fed. Appx. 531, 536-37 (6th Cir. 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

5

Courts in other circuits have found that "[w]itness testimony translated from a foreign language must be properly authenticated and any interpretation must be shown to be an accurate translation done by a competent translator." *Jack v. Trans World Airlines, Inc.*, 854 F. Supp. 654, 659 (N.D. Cal 1994) (citing Fed. R. Evid. 604 and 901).[5] This standard is required because affidavits are generally ex parte, and the opposing party does not have the opportunity to examine the qualifications of an interpreter and object. *Miranda v. Sweet Dixie Melon Co.*, No. CIV.A.7:06-CV-92(HL), 2009 WL 1324847, at *2 (M.D. Ga. May 13, 2009) (striking an affidavit when the translator was an employee of plaintiff's counsel and would have a motive to distort the translation in favor of plaintiff's case).

Defendants submitted dozens of essentially identical affidavits signed by the workers at issue in support of their Motion for Summary Judgment. (Doc. Nos. 59-2 to 59-22, 63-1 to 63-28, 72-1, 72-2, hereinafter "Workers' Affidavits"). From the record, it appears that many, if not all, of the workers at issue in this litigation are native Spanish-speakers who speak no, or only limited, English. (Doc. No. 61 at 15, 58; Doc. Nos. 66-3 at 2; 66-4 at 2, 66-5 at 2, 66-6 at 2). Plaintiff argues that many of these affidavits should not be considered because they are translations into English from Spanish, and they are the product of coercion. (Doc. No. 64 at 5-6).

Plaintiff submitted four statements of workers who signed affidavits. Freddy Gutierrez was the only employee to attach his name to his statement. He stated that he was taken to sign paperwork during his workday, that he did not speak or write English, that he was scared he would lose his job if he did not sign the form, and that *after* he and other workers signed the forms they

---

[5] A different rule applies when an interpreter is used to translate a deposition; in that situation, the interpreter need only be sworn. *Miranda v. Sweet Dixie Melon Co.*, No. CIV.A.7:06-CV-92(HL), 2009 WL 1324847, at *1 (M.D. Ga. May 13, 2009). No party has raised an issue with the interpreters present at many of the depositions in this case.

6

were shown Spanish versions. (Doc. No. 66-3 at 2). Three anonymous workers also signed statements, with two stating they did not read or speak English and another stating he read the translated Spanish version but was scared he would be fired if he did not sign. (Doc Nos. 66-4 at 2, 66-5 at 2, 66-6 at 2). Defense counsel and Maria Rosario Rosales Guzman (an employee of Defendants) were present when many of the workers were given the affidavits to sign. (Doc. No. 73 at 1-2).

After Plaintiff raised opposition, Defendants submitted an affidavit of Guzman, which described the process of taking the workers' affidavits. Guzman stated that she drove some of the workers to the Defendants' attorneys' office. (Doc. No. 70 at 1). Guzman laid on the table, prior to the workers signing anything, both a Spanish and English version of the form affidavit. (*Id.*at 1). Guzman regularly interprets Spanish into English for the workers. (Doc. No. 54-3 at 3). She stated that she provided an accurate representation of the affidavits and the contents, told the workers they did not have to sign, and did not threaten their jobs. (Doc. No. 70 at 1-2). Defendants also provided a declaration of Andrew H. Davis, Counsel for the Defendants, who stated that a Spanish translation was provided to all workers, that he was available to answer questions, that he advised the workers they did not have to sign, and that one worker stated he was not comfortable signing then and chose to sign the affidavit at a different time. (Doc. No. 71 at 1-3). As Exhibit A to Guzman's affidavit, the Court was provided with a copy of the Spanish version of the affidavits signed by the workers.

Because of the Defendants' evidence that the workers were concurrently provided a version of the affidavits translated into Spanish and were not forced to sign the affidavits, the Court finds the affidavits to be admissible for the purposes of this summary judgment motion. Though the Plaintiff has raised valid concerns regarding the legitimacy of the affidavits, the Court finds that

7

they are not sufficient to warrant excluding the affidavits, even though they do bear on the weight to be afforded the affidavits. The Court will use these affidavits for what they are: identical statements of the workers at issue, adopted under the particular circumstances reflected by the record as discussed above.

## "EMPLOYEES" UNDER THE FLSA

In 1938, Congress passed the FLSA in order to ensure a "minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). Under the FLSA, employees are entitled to its protections, but independent contractors are not. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947); *Keller v. Miri Microsystems, LLC*, 781 F.3d 799, 806-07 (6th Cir. 2015). An employee, but not an independent contractor, will be entitled to overtime compensation for hours worked over 40 hours a week. *Keller*, 781 F.3d at 806. The FLSA defines "employee" as "any individual employed by an employer" and "employ" as "suffer[ed] or permit[ted] to work." 29 U.S.C § 203(e)(1), (g). "Employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "These definitions are patently circular—tautological—thus begging the question of what they really mean." *Alvarado Martinez v. First Class Interiors of Naples, LLC*, No. 3:18-CV-00583, 2020 WL 3316115, at *5 (M.D. Tenn. June 18, 2020).[6]

---

[6] As this Court previously noted in an ERISA case involving similarly tautological definitions:

> To the extent that a definition is circular—that is to say, tautological—it tends to be unhelpful. *See, e.g., Arreola-Castillo v. United States*, 889 F.3d 378, 386 (7th Cir. 2018) (disregarding various dictionary definitions of the word "validity" as "unhelpful tautologies"); *Phillips 66 Pipeline LLC v. Rogers Cartage Co.*, No. 11-cv-497-DRH- DGW, 2013 WL 4083623, at *5 (S.D. Ill. Aug. 13, 2013) (noting that CERCLA defines "owner or operator" in unhelpful fashion, *i.e.*, only by tautology).

8

The standard in the Sixth Circuit to determine (based on the relationship between the paying business and the worker) whether a worker is an employee as opposed to an independent contractor is that "employees are those who as a matter of economic reality are dependent upon the business to which they render service." *Keller*, 781 F.3d at 807 (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984)). The Sixth Circuit has identified six non-determinative factors to guide this economic-reality test: "1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; . . . 5) the degree of the alleged employer's right to control the manner in which the work is performed[; and] . . . [6] ] whether the service rendered is an integral part of the alleged employer's business." *Id.* at 807 (quoting *Brandel*, 736 F.2d at 1117). The Sixth Circuit also considers additional relevant factors, such as whether a defendant maintains employment records for an individual or has the authority to hire and fire an individual. *Id.* Notably, the parties' agreement to label the worker an "employee" or "independent contractor" will not be determinative as to the status of the worker, and the Court will look past the parties' labels to the economic reality of the relationship.[7] *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1055

---

*Flannery v. Tune Imports, Inc.*, No. 3:18-CV-00584, 2020 WL 2512825, at *2 (M.D. Tenn. May 15, 2020).

[7] It is undisputed that independent contractor agreements signed by the workers were backdated as a memorialization of the prior oral agreements between the parties. (Doc. 65 ¶ 14; Doc. No. 54-10; Doc. No. 59-1 at 4). As such, Plaintiff argues that these agreements should not be considered by the Court. (Doc. 65 ¶ 14). The Court recognizes these documents as admissible for what they are—backdated documents reflecting a purported prior agreement between the signing parties. The Court additionally recognizes that the Workers' Affidavits state that the respective affiants considered the relationships to be that of independent contractors, not of employees. (Worker's Affidavits at 4). However, Defendants' labeling of the relationship, especially when such labeling only came after the start of a lawsuit from the Department of Labor, is not dispositive in this matter.

(6th Cir. 2019) (quoting *Keller*, 781 F.3d at 804). "The issue of the employment relationship does not lend itself to a precise test, but is to be determined on a case-by-case basis upon the circumstances of the whole business activity."[8] *Brandel*, 736 F.2d at 1116; *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992) ("This test is a loose formulation, leaving the determination of employment status to case-by-case resolution based on the totality of the circumstances.").

---

The Court will look past the labels applied to the workers and to the economic realities of the relationship to determine the workers' status.

[8] Defendants contend that Plaintiff has not presented enough evidence regarding each worker's specific relationship with Defendants. (Doc. No. 58 at 16-17). Defendants read *Brandel* as requiring specific evidence for each employee at issue. (Doc. No. 60 at 2-3). But as indicated by the part of *Brandel* cited by Defendants, what *Brandel* looked unfavorably on was the Secretary attempting to create a *per se* rule naming a category of workers as "employees" for all contexts and all cases irrespective of the case-specific relationship between the particular defendant and particular group of plaintiff-workers at issue. *Brandel*, 736 F.2d at 1120; (*Id.*). Here, Plaintiff deposed one of the workers from the relevant group and conducted initial interviews with seven workers. (Doc. No. 54-6; Doc. No. 64 at 4). Plaintiff offers little reasoning for its presentation of limited evidence, merely stating in its Response that it felt the need to limit interaction because it found Defendants to be deceptive in presenting the worker's affidavits and the backdated independent contractor agreements (both of which the Court finds admissible, as discussed above). (Doc. No. 64 at 6) ("[T]he Secretary made the conscious choice to limit his proof to that which was absolutely necessary at this stage in the proceeding."). Though the Court recognizes that Plaintiff has taken only one deposition of a worker, the Court will weigh this evidence for what it is—one worker's particular (and limited) testimony. Although Plaintiff lacks certain evidence that would aid Plaintiff if in fact it existed, the record contains enough evidence for the Court to find a genuine dispute of material fact as to the status of the workers. Plaintiff here is not attempting to create a per se class categorization of all drywall workers as employees rather than independent contractors. Plaintiff instead focuses on the relationship of the workers listed in the Complaint to these particular Defendants. It is true that there is a dearth of deposition testimony from the workers at issue, but there is evidence on the record (including some put forth by the Defendants themselves and the Plaintiff's interviews with Defendants' other workers not at issue in this case) sufficient to create a genuine issue of fact as to whether the workers were employees as Plaintiff claims they were. When discussing the factors below, the Court often references worker Ramirez's deposition. The Court recognizes that much of Ramirez's testimony reflects only his own experience working for Defendants, and not the entire group of workers' experiences. However, some of Ramirez's testimony pertains to Defendants' practices more generally, and other evidence in the record also indicates the working conditions for the workers as a whole. The Court finds the evidence, taken cumulatively, to be sufficient to find summary judgment improper for the group of workers as a whole.

10

Whether a plaintiff is an employee under the FLSA is a mixed question of law and fact. *Lilley*, 958 F.2d at 750 n. 1. "[W]here there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed fact . . . the question is to be resolved by the finder of fact in accordance with the appropriate rules of law." *Id.* "Summary judgment for the defendant is not appropriate when a factfinder could reasonably find that a FLSA plaintiff was an employee." *Keller*, 781 F.3d at 816.

As noted, this question is resolved by application of a multi-factor test. The undersigned will reiterate here what he said recently in connection with a different multifactor test: "The undersigned has noted on multiple occasions that multi-factor (or balancing) tests, though often having considerable desirability and merit, tend to foster outcomes that are unpredictable on the front end, given such tests' subjectivity." *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *16 (M.D. Tenn. Aug. 28, 2020) (quoting Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1050 (1997) (proposing a multi-factor test to resolve civil limitations issues, while conceding that when courts "apply[ ] a multi-factor test, [it is] always an unpredictable endeavor") and Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 95 (1995) (proposing multi-factor test to resolve collateral estoppel issues, while conceding that its drawback is that it "would produce unpredictable resolutions of collateral estoppel issues, in that it is so flexible and calls for very subjective judicial determinations")). This reality tends not to bode well for the prospects of a multi-factor test to resolve a question as a matter of law at the summary judgment stage.

1. <u>PERMANENCY OF THE RELATIONSHIP</u>

"Generally, independent contractors have variable or impermanent working relationships with the principal company because they 'often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas "employees" usually work for only one employer and such relationship is continuous and indefinite in duration.' . . . We may look at the length and regularity of the working relationship between the parties, but even short, exclusive relationships between the worker and the company may be indicative of an employee-employer relationship." *Keller*, 781 F.3d at 808 (citations omitted). Depending on the circumstances, even several weeks may be enough to create an employment relationship. *See LeMaster v. Alternative Healthcare Sols., Inc.*, 726 F. Supp. 2d 854, 861 (M.D. Tenn. 2010). However, the Sixth Circuit has also indicated that a mutually beneficial relationship, where an individual gives work to the same workers multiple times due to satisfaction with past performance, does not automatically create an employment relationship. *Brandel*, 736 F.2d at 1117.

According to Peregrino, Defendants would contract with workers only on a per-project basis, but they would use some workers "fairly consistently." (Doc. No. 54-5 at 4; Doc. No. 59-1 at 2). The projects can last anywhere from a few weeks to months, but the workers are never hired for an indefinite period. (Doc. No. 59-1 at 3; Workers' Affidavits at 2). After a contract with a worker ended, both Defendants and the worker understood that the worker could then accept work from another contractor. (Doc. 59-1 at 2; Workers' Affidavits at 2). A worker could also accept work from another contractor during a project with Defendants if the worker was able to meet deadlines on the project for Defendants. (Doc. 59-1 at 2; Workers' Affidavits at 2). It is unclear from the record whether the workers were actually able to exercise this prerogative to accept work from another contractor. Since work hours were set by those (associated with the general

12

contractor) running individual job sites and the workers often carpooled, (Workers' Affidavits at 3), it seems that there may not have been a real opportunity, as a practical matter, to work for other contractors or pursue additional economic opportunities outside the relationship with Defendants. *See Keller*, 791 F. 3d at 808 (noting that the limitations of travel time and availability of customers indicated "slim control over [the plaintiffs] working hours and little ability to work for other companies."). According to Ramirez's testimony, he worked exclusively for Defendants for a period of about four years. (Doc. No. 54-6 at 4, 7).

However, many of the workers seem to have had periods during which the workers did not work for Defendants.[9] (Doc. No. 65 at ¶ 54). That is, many of the workers worked only a portion of the relevant period for Defendants, but some of the workers appear to have worked consistently during the period at issue. (*Id.* at ¶¶ 55, 56). Horacio Ramirez, the only worker deposed by Plaintiff, worked exclusively for Defendants but did not do so entirely continuously; he had several gaps in his working relationship with Defendants. (Doc. Nos. 57-8 at 17-18; Doc. No. 65 ¶ 59).

Though several facts indicate that the workers had a permanent relationship with Defendants, reasonable minds could differ as to whether this factor leans in favor of a finding that

---

[9] Plaintiff objects to the information recited in this paragraph (the paragraph to which this footnote is attached) because this was supported solely by Plaintiff's initial disclosures. Plaintiff does not dispute that the information is accurate. (Doc. No. 65 at 38). Under the local rules, facts used to support a motion for summary judgment must be supported by a citation to the record. L.R. 56.01(b). The record is defined as "deposition transcripts, answers to interrogatories, affidavits, requests for admissions, and documents filed in support of or in opposition to the motion or documents otherwise in the court file." L.R. 56.01(e). Since they are not on the record, the Court will not consider statements of fact that are supported only by the Plaintiff's initial disclosures. However, the Court will consider the Wage Calculation sheets, as these were filed by Defendants as Doc. Nos. 57-5 through 9 in support of Defendants' motion for summary judgment. Much of the information in this paragraph was supported by citations only to the Plaintiff's initial disclosures, but the information is verified by the Wage Transcription and Computation Worksheets filed by the Defendants in support of their motion. The Court will consider these facts to the extent that they are supported by the record, meaning just the Wage Transcription and Computation Worksheets.

the workers were employees rather than independent contractors. Accordingly, this particular factor does not support either side's contention that (considering all the factors) it has shown the absence of a genuine issue as to the workers' employment status (and that the issue therefore can be resolved in its favor as a matter of law).

## 2. DEGREE OF SKILL REQUIRED

If an individual possesses special skills (the kinds of things requiring initiative, judgment and/or foresight), they are more likely to be an independent contractor. *Keller*, 781 F.3d at 809. The inquiry here is whether the worker's "profits increased because of the 'initiative, judgment[,] or foresight of the typical independent contractor,' or whether his work 'was more like piecework.' " *Id.* (citation omitted). When experience hanging drywall is gained independently of any training or control by an alleged employer, the expertise required to hang drywall has been found to indicate an independent contractor relationship. *See Mulzet v. R.L. Reppert, Inc.*, 54 F. App'x 359, 360 (3d Cir. 2002).

Plaintiffs allege that Defendants do not require previous drywall experience of their workers, while Defendants claim that they hire only workers with previous experience. (Doc. No. 61 ¶ 3; Doc. No. 65 ¶ 7). Peregrino testified that he uses only workers whom he has worked with in the past or whom have drywall experience due to the skills required to timely complete a job, and he testified that when he has hired workers without prior experience he has then needed to hire additional workers in order to complete a project on time. (Doc. No. 54-5 at 8; Doc. No. 59-1 at 2). From the record, it appears that drywall work requires skill because of the necessary use of different tools, the need to abide by construction codes (as supervised by the contractors), the preexisting experience and training Defendants claim they require, and the fact that inexperienced workers are unable to complete jobs in a timely manner. *See Keller*, 781 F.3d at 809 (noting the

14

significance of prior training and certificates, the preexisting knowledge of power tools, and familiarity with relevant code provisions when finding a dispute of material fact on this factor); (Doc. No. 54-5 at 8, 14, 23).

On the other hand, one of Defendants' office workers testified that she believed that workers were not required to have prior experience and were trained on the job.[10] (Doc. No. 54-4 at 13). There is no evidence that the workers are required to have any special certificates or training, and though inexperienced workers may have been less efficient, they were still able to do the tasks required. *See Keller*, 781 F.3d at 809; (Doc. No. 54-5 at 8). There is also no indication that Defendants picked workers for particular jobs based on their level of experience or skill, instead they picked workers based on availability and willingness to work. *See Keller*, 781 F.3d at 809; (Doc. No. 54-5 at 4; Doc. No. 59-1 at 2).

Accordingly, there is a genuine dispute of fact regarding the level of skill the drywall workers needed to perform work for Defendants. Accordingly, this particular factor does not support either side's contention that (considering all the factors) it has shown the absence of a genuine issue as to the workers' employment status.

---

[10] Defendants attacked the credibility of this witness in their Response to Plaintiff's Undisputed Statements of facts, since she did not go to the jobsites and admitted that she did not know certain things about Defendants' business. (Doc. No. 61 ¶ 23). The testimony is unclear as to whether the witness knew of specific instances of workers *actually* being hired—as opposed to merely being *eligible* to be hired—without experience and then being trained on the job. Regardless, though he claimed it was not his general practice, Peregrino admitted that he had, at least on some occasions, actually hired workers without prior experience and found their work to be less efficient. (Doc. No. 54-5 at 8; Doc. No. 59-1 at 2). Credibility judgments and weighing of evidence are generally improper at the summary judgment stage. *Hostettler*, 895 F.3d at 852. That is certainly true in this particular instance. The Court finds the testimony sufficient to produce a dispute as to material fact.

15

3. <u>INVESTMENT IN TOOLS AND MATERIALS</u>

If an individual has "made a significant capital investment in [his or her] business" as opposed to simply using the tools and resources of a company, it will indicate that a worker is an independent contractor. *Keller*, 781 F.3d at 810, 811. If an industry is of a nature where no party would be required to make a significant capital investment in tools and other resources, this factor will be less important to the overall analysis. *See Brandel*, 736 F.2d at 1119 (finding this factor less important when pickle farmers provided their own pails and gloves, and the landowner had on hand general agriculture machinery). Additionally, courts have found that where workers are able to rent tools and vehicles and have the costs deducted from their paychecks, this factor is less likely to lean in favor of independent-contractor status. *Swinney v. AMcomm Telecommunications, Inc.*, 30 F. Supp. 3d 629, 637 (E.D. Mich. 2014).

According to Peregrino, hanging and finishing drywall generally requires hand tools like spatulas, mud trays, tool belts, sanders, and automatic tape dispensers (often called "bazookas"). (Doc. No. 54-5 at 15; Doc. No. 59-1 at 4). Materials needed include drywall sheets, mud, and tape. (Doc. No. 54-5 at 14; Doc. No. 59-1 at 4). Less commonly, stilts and scaffolding would be needed. (Doc. No. 59-1 at 4-5).

It is undisputed who provides some of the tools. On projects with Defendants' workers, Peregrino stated in his affidavit that the general contractor provides scaffolding. (Doc. No. 59-1 at 4-5). The Defendants' workers provide their own trays and spatulas. (Doc. No. 54-6 at 17, 21; Doc. No. 59-1 at 4-5). Ramirez estimated that the trays and spatulas cost less than $50 combined. (Doc. No. 54-6 at 17, 21). Peregrino testified that the workers were responsible for providing sanders. (Doc. No. 54-5 at 15).

16

There is a dispute, however, as to who provided most of the tools required for the workers to do their jobs. Peregrino testified during a deposition that the stilts were provided by the workers, but Ramirez testified that Peregrino provided the stilts. (Doc. No. 54-5 at 14; Doc. No. 54-6 at 11). Peregrino testified that the general contractors provided tape, but Ramirez testified that Peregrino would provide tape. (Doc. No. 54-5 at 14; Doc. No. 54-6 at 11). Ramirez additionally testified that Peregrino provided bazookas, and that and a trailer attached to Defendants' van contained tools, helmets, trays, and work boots used by the workers. (Doc. No. 54-6 at 11). One of Peregrino's office workers confirmed in her deposition that the Defendants' vans had trailers attached which contained various tools.[11] (Doc. No. 54-4 at 7). However, Peregrino stated in his affidavit that he informed the workers that they would be responsible for providing their own tools, by which he seems to mean virtually all tools beyond scaffolding. (Doc. No. 59-1 at 3). The workers confirmed that they knew they were responsible for providing their own tools if the tools were not provided by the general contractor. (Workers' Affidavits at 3).

Defendants provided several tools but deducted the costs of those tools from the Plaintiff's paychecks. (Doc. No. 61 at ¶ 47). Peregrino testified that he kept an account with a tool rental business for drywall tools. (Doc. No. 54-5 at 10). On an as-needed basis, Peregrino stated in his affidavit that he would advance the cost of tools to a worker who would be responsible for the cost. (Doc. No. 59-1 at 3). Defendants would also sometimes arrange housing and transportation for the workers which would be deducted from the workers' pay. (Doc. No. 61 at ¶ 51; *see also* Doc. No. 59-1 at 3; Doc. No. 54-2 at 9; Workers' Affidavits at 3). Defendants own vans for this

---

[11] Defendants again attacked the credibility of this witness in their Response to Plaintiff's Undisputed Statements of facts, since she had not inspected the trailers and did not know much about the tools inside the trailers. (Doc. No. 61 ¶ 38). Credibility judgments and weighing of evidence are improper at the summary judgment stage. *Hostettler*, 895 F.3d at 852.

purpose, maintain records regarding the cost of maintaining the vans, and submit these records to their tax preparer. (Doc. No. 61 ¶ 41).

Defendants would also occasionally provide tools when needed on a particular project. On one occasion, a general contractor informed Peregrino that he did not have the budget for scaffolding, and Peregrino rented the scaffolding since he would not be paid unless the workers had scaffolding to finish the job. (Doc. No. 61 at ¶ 45; Doc. No. 54-5 at 11; Doc. No. 59-1 at 5). Another time when a boom lift was needed, Defendants rented it in order to complete a job. (Doc. No. 61 at ¶ 45; Doc. No. 54-5 at 11). Peregrino testified that he also had to provide mud on one occasion. (Doc. No. 54-5 at 14).

Though much of this evidence is contradictory, the parties agree that the workers were responsible at least for purchasing their own trays and spatulas, valued at less than $50. There is a real dispute as to who provided many of the tools involved in laying and finishing drywall, including stilts, tape, bazookas, helmets, trays, and work boots. Peregrino also admittedly would occasionally rent tools such as scaffolding, a boomlift, and mud when needed. Defendants would also provide tools, housing, and vans and deduct the cost out of the worker's checks, which leans in favor of an employment relationship. The Court finds that since none of the tools needed for drywall laying and finishing require significant capital investment this factor is less important to the overall analysis than it might otherwise be. *See Brandel*, 736 F.2d at 1119.

Regardless, there is still a significant, and genuine, dispute over who provided what tools for the workers. Accordingly, this particular factor does not support either side's contention that (considering all the factors) it has shown the absence of a genuine issue as to the workers' employment status.

18

4.  BONA FIDE OPPORTUNITY FOR PROFIT OR LOSS

This element looks at whether the workers had an opportunity for profit or loss, and if they could have increased their efficiency or business structure in some way so as to bring in more money for themselves. *Keller*, 781 F.3d at 812. Mere opportunities to accept more or less work and to schedule one's own time do not reflect a use of managerial skill; instead, a court should look to the ability and opportunity to work more efficiently and increase the worker's own profits. *Off Duty Police Servs. Inc.*, 915 F.3d at 1059.

Defendants paid the Drywall Workers in a piece-rate fashion per sheet of drywall hung. (Doc. No. 61 ¶ 24). Though the rate varies from project to project, Defendants typically compensate the drywall hangers at a rate of approximately $6 to $7 a sheet and drywall finishers at a rate of $7.50 a sheet. (Doc. No. 61 ¶ 25; Workers' Affidavits at 2). According to affidavits of Peregrino and the workers, each worker offered a project could negotiate the per-sheet price for that particular project before agreeing to take it, and sometimes a worker could renegotiate after taking a project if there was a change in circumstances. (Doc. No. 59-1 at 2; Workers' Affidavits at 2). Additionally, workers were able to turn down work and were not forced to accept a particular project. (Doc. No. 59-1 at 2). Workers were free to take other work after finishing, or even during, a job, as long as they were able to meet their deadlines on the current job. (Workers' Affidavits at 2). Guzman testified that there were no set days that a worker needed to spend on a particular project, stating "if they've got 1200 sheets to do, they can do them in five days or ten days, depending on how fast they go." (Doc. No. 54-3 at 17).

Aside from perhaps not completing a project, losing time working on a project, or not making enough to cover their expenses owed to Defendants (for living, transportation, and tools), there is no real opportunity for the workers to lose money in their ventures laying and finishing

19

drywall. *See Perez v. Howes, 7 F. Supp. 3d 715, 725 (W.D. Mich. 2014), aff'd sub nom. Perez v. D. Howes*, LLC, 790 F.3d 681 (6th Cir. 2015) (finding no opportunity for loss when the only investment of the workers was time and travel).

Reasonable minds could differ regarding whether there was a legitimate opportunity for profit. On the one hand, workers were able to negotiate their sheet price up front, and/or even renegotiate later. There is some indication that workers could work more efficiently and thereby be able to take on other contracts or finish a job early, allowing them to take on more work. This indicates that the workers had an opportunity to maximize profits by negotiating and managing their own schedules. On the other hand, an opportunity for profit does not necessarily arise when the only way to increase profits would be "by working longer, harder, and smarter." *Perez*, 7 F. Supp. 3d at 725. Mere control over one's own schedule does not indicate a bona fide opportunity for profit when there is not an opportunity to use efficiency to maximize profits. *Off Duty Police Servs., Inc.*, 915 F. 3d at 1059. Each work site was open for limited hours, subject to the general contractor's schedule, indicating that a worker's options for working more on a particular site, or working more by juggling multiple drywall jobs simultaneously, was necessarily limited. Defendants also negotiated an initial price per sheet with the contractors, which would have limited how much the workers were able to negotiate their own pay with Defendants. (Doc. No. 61 ¶ 3).

So as to this factor, genuine disputes of fact exist. Accordingly, this particular factor does not support either side's contention that (considering all the factors) it has shown the absence of a genuine issue as to the workers' employment status.

5. <u>RIGHT TO EXERCISE CONTROL OVER THE WORK</u>

The fifth factor examines how much control over the workers Defendants exercised and had the authority to exercise. *Keller*, 781 F.3d at 814-15. Some factors that can indicate a

defendant's level of control include control over scheduling, the ability to take on other contracts, ability to discipline, and overall supervision of the worker's work product. *Keller*, 781 F.3d at 814-15; *Brandel*, 736 F.2d 1119. It is disputed, with compelling evidence on both sides, what degree of control that Defendants exercised over the various individual job sites.

Defendants claim that they exercised little control over the individual job sites. Peregrino stated in his affidavit:

> I did not monitor, supervise, or instruct the workers on how to perform the work. Each job site had safety regulations and work standards, which were set and enforced by the general contractor's superintendent. I did not decide if the work was adequately done. The general contractor's superintendent did all of the inspections and made the determination of whether any work needed to be redone. I was not routinely present on the job site to provide instructions to the workers about how the work was to be done.

(Doc. No. 59-1 at 5). The workers additionally stated that Defendants did not control the manner in which work was performed and that no one from Defendants' team was regularly on site to monitor the work. (Workers' Affidavits at 4). Peregrino stated in his affidavit that he would visit the job sites only occasionally to translate for the workers, such as if a superintendent or general contractor (who usually spoke only English) needed to communicate work that should be redone to the Spanish-speaking workers or if no one was available to translate a safety meeting into Spanish for the workers. (Doc. No. 59-1 at 6; *see also* Doc. No. 54-3 at 11, 21). Peregrino also would visit the job sites in order to tally sheets hung in order to know how much to pay the workers. (Doc. No. 59-1 at 6). Guzman testified that she went to the job sites often to translate the safety meetings into Spanish for the workers or to communicate corrections from the a superintendent or general contractor. (Doc. No. 54-3 at 11, 21; *see also* Doc. No. 59-1 at 6).

Peregrino stated in his affidavit that he did not set hours for the workers, and "[t]hey were free to arrive at a particular job site whenever they saw fit and to stay at that job site as late or

leave as early as they wanted, so long as the general contractor allowed it." (Doc. No. 59-1 at 5; *see also* Doc. 54-3 at 11 (noting that the hours a particular site would be open were set by those running that job site, and not by Defendants)). Peregrino also stated that he did not set lunch breaks for his workers. (Doc. No. 59-1 at 5). Guzman testified that leaving early would not affect a worker's pay, because they were paid per sheet. (Doc. No. 54-3 at 17). Additionally, an office worker testified that she did not even have any records of the hours the workers worked; she had records only of how many sheets they had laid. (Doc. No. 54-4 at 15). The workers stated that Defendants did not set hours for them and that they were able to take breaks or choose not to work certain days at their own discretion. (Workers' Affidavits at 3-4). General contractors would have morning safety meetings and required workers to attend, but Peregrino stated in his affidavit that he did not have the authority to force a particular worker to attend these meetings. (Doc. No. 59-1 at 5). Peregrino also noted that if a worker chose not to come to work, he did not have the authority to make the worker show up. (*Id.* at 5). Additionally, Defendants did not require the workers to wear a uniform or anything to identify that the workers were affiliated with Defendants. (*Id.* at 6; Workers' Affidavits at 4).

Plaintiff claims that Defendants did, in fact, exercise control over the work sites and the manner in which work was performed. Peregrino stated in his affidavit that he would sometimes ask a worker he trusted to act as a "person in charge" to keep track of absent workers in order to calculate pay, to operate as the primary contact with a site superintendent, and to explain safety regulations and standards to the other workers. (Doc. No. 59-1 at 6). Ramirez was one of these "persons in charge." (*Id.* at 6). Ramirez testified during his deposition that, on behalf of Peregrino, he would check on workers to see how they were doing their jobs and report back to Peregrino. (Doc. No. 54-6 at 10). Ramirez testified that Peregrino told him to arrive around 7:00 in the

morning and that he would write down for Peregrino when people left early from a job site. (*Id.* at 11-12). Ramirez testified that Peregrino would ask him every week for a report on who had left early that week. (*Id.* at 13). Ramirez also testified that the workers were given a one-hour lunch break every day. (*Id.* at 12).

So as to this factor, genuine disputes of fact exist. Accordingly, this particular factor does not support either side's contention that (considering all the factors) it has shown the absence of a genuine issue as to the workers' employment status.

6.  INTEGRAL SERVICES

The final enumerated factor in the economic-reality analysis is whether the workers render a service that is integral to the Defendants' business. *Keller*, 781 F.3d at 815. This factor is not dispositive. *See Brandel*, 736 F.2d at 1120. The workers at issue render the services of laying and finishing drywall, and Defendants' sole business is providing drywall laying and finishing services. It is not disputed by the parties that the services rendered by the workers are integral to Defendants' business, (Doc. No. 60 at 17), and a reasonable jury would conclude that workers are integral to Defendants' business.

This factor, viewed in isolation, indisputably suggests that the workers were employees. It thus tilts in favor of Plaintiff. Accordingly, this particular factor supports Plaintiff's contention that (considering all the factors) it has shown the absence of a genuine issue as to the workers' employment status and that the workers were employees as a matter of law.

7.  OTHER FACTORS

"The economic-reality test is not an exclusive list of factors. We may and should look to other evidence in the record to determine whether the totality of the circumstances establishes that

[Defendants] employed [workers]." *Keller*, 781 F.3d at 815. The Sixth Circuit additionally examines whether a defendant maintained records of the workers and whether a defendant had the ability to hire or fire the workers. *Keller*, 781 F.3d at 807 (quoting *Ellington v. City of E. Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012)).

Defendants maintain records for each employee that include "[w]orker documents, copies of their IDs, copies of their W7s; if they have an account—a bank account, address . . . what job they are doing, and where that work is." (Doc. No. 61 at ¶ 28; Doc. No. 54-3 at 5). As testified to by one of their office workers, Defendants additionally keep track of how many sheets a worker has completed in order to pay them. (Doc. No. 54-4 at 15). This additional factor weighs in favor of an employment relationship.

There is a lack of evidence regarding the authority to hire and fire the workers. Three individuals testified during their respective depositions that the need to fire a worker had never arisen for Defendants. Specifically, Ramirez testified that he did not have the authority to fire anyone when he oversaw other workers as a "person in charge," and that he did not know of any instances where any of the workers were fired. (Doc. No. 54-6 at 11). Guzman also testified that no worker she knew of had been fired; she had previously been called to a worksite to translate a conversation when a worker broke jobsite rules, but the intention of the conversation was not for Peregrino to fire the worker. (Doc. No. 54-3 at 11). And Peregrino testified during his deposition that he had never had a worker do poor work. (Doc. No. 54-5 at 8). However, the question here is not whether Defendants have ever hired or fired workers previously, but rather whether they had the *authority* to hire or fire. *Keller*, 781 F.3d at 807. Here, it is unclear if Defendants possess that authority since the need to fire a worker has apparently not arisen.

24

Therefore, due to the lack of evidence either way, this factor does not weigh in favor of either party. Accordingly, this particular factor does not support either side's contention that (considering all the factors) it has shown the absence of a genuine issue as to the workers' employment status.

## <u>CONCLUSION</u>

As portended by the Court's discussion of the applicable factors, Plaintiff's Cross Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment will be denied. Neither side has met its initial burden under Rule 56 as the summary judgment movant with respect to the workers' status (as either employees or independent contractors), and even if it had, the respective non-movant would have been able to meet its resulting burden under Rule 56 of raising a genuine issue as to that matter fact.[12] Though one of the factors in the economic-realities test clearly weigh in favor of Plaintiff, almost all of the factors are subject to legitimate disputes of material fact on which reasonable people could disagree. And accordingly, there is a genuine issue of material fact as to the overarching question the factors address—whether the workers are

---

[12] The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts, and if (but only if) the movant meets that burden, the non-moving party must set forth specific facts showing there is a genuine dispute of material facts. *Pittman*, 901 F.3d at 627-28. Here, neither party is entitled to summary judgment, because neither party has met its initial burden of convincing the Court that there is an absence of a genuine dispute of material fact as to the workers' status. And even if one or the other of the parties had met this initial burden, the Court would find that such party nevertheless was unentitled to summary judgment; assuming arguendo that each party, in its capacity as the movant, had shifted the burden to the other party (in its capacity as non-movant) to show evidence showing a genuine dispute of material fact as to the workers' status, the Court finds that the non-movant has shown sufficient evidence to meet that burden. That is to say, each party, respectively, in its capacity as the party opposing summary judgment has, as explained herein, enough evidence on its side to raise a genuine issue as to the workers' status to defeat summary judgment for the opposing (moving) party—even if that moving party could be credited with having shifted the burden to the non-movant in the first place.

employees or independent contractors. And thus summary judgment is inappropriate for either side. The appropriate weight of the factors as a whole can be assessed more properly after a trial.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE